IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**UNITED STATES OF AMERICA,**

    Plaintiff,

v.                                                                Case No. 3:10cr101/MCR

**DENNIS M. CARONI, GERARD M.
DILEO, THEODORE G. AUFDEMORTE,
JR., and JOSEPH GEORGE PASTOREK, II,**

    Defendants.

_____/

## ORDER

The defendants were indicted on or about September 22, 2010, and charged with a conspiracy to dispense controlled substances, resulting in one or more deaths, in violation of 21 U.S.C. § 841(b)(1)(C) and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(I) and (h).[1]  The matter is set for trial beginning October 17, 2011.  Defendant Dennis M. Caroni has filed a motion seeking to exclude the testimony of the government's proposed expert witnesses, Dr. Ted Parran, Dr. Robin J. Hammil-Ruth, and Paul Doering.  With respect to Dr. Parran, Caroni argues that the conclusions set forth in his reports are not based on sufficiently reliable facts and data, are the product of unreliable principles and methods, and/or that Dr. Parran did not reliably apply the principles and methods to the facts of this case and, thus, Dr. Parran's testimony should be excluded under Rule 702 of the Federal Rules of Evidence.  Specifically, Caroni argues that Dr. Parran's initial report, dated May 20, 2007, is based on his review of more

---

[1] The charges against Theodore G. Aufdemorte, Jr., have been dismissed on motion of the government.  *See* doc. 297.

Case No. 3:10cr101/MCR

than 100 medical records from Chronic Pain Management, LLC ("CPM"), a clinic not referenced in the indictment in this case. As Caroni explains, three pain management clinics are at issue in this matter. The first clinic was opened in Metairie, Louisiana, on our about January 1, 2004, and, according to the indictment, operated under various names, including Global Health Care, LLC; Global Health, LLC; Global Pain Management, LLC; Global Care, LLC; and Global Health Care Physical Medicine and Pain Management.[2] The second clinic was opened in Covington, Louisiana, on or about September 30, 2004, under the name Global Northshore Pain Management Clinic, LLC ("Global Northshore").[3] The third clinic was opened in Pensacola, Florida, on or about March 21, 2005, under the name Global Pensacola Pain Management, LLC ("Global Pensacola").[4] Caroni, who is not a physician, owned and operated the clinics while Dileo and Pastorek worked as prescribing physicians at GPM and Global Northshore.[5] The government alleges that Caroni and Dileo hired personnel to operate Global Pensacola as an affiliate of GPM and Global Northshore but acknowledges that Global Pensacola operated for only a brief period of time, closing in early April 2005. Caroni insists that neither he nor the other defendants in this case had any involvement with GPM after April 14, 2005.[6]

Caroni argues that Dr. Parran's testimony regarding prescribing practices at CPM has no bearing on the question of whether the doctors involved in this case engaged in improper prescribing practices while working at the Global clinics. The government

---

[2] In the indictment, the government alleges that Caroni and Aufdemorte established Global Pain Management, LLC ("GPM"), which was the registered name of the Metairie clinic.

[3] According to the indictment, Caroni, Aufdemorte, and Dileo established Global Northshore.

[4] Caroni is the only defendant associated with the opening of Global Pensacola.

[5] The Metaire, Covington, and Pensacola clinics are referred to collectively as "the Global clinics."

[6] According to Caroni, Mark Artigues and Kathy Landry, both of whom were employees of Global Pensacola, convinced him to close the business shortly after it opened and then, without Caroni's knowledge or participation, Artigues and Landry opened another pain management clinic, Control Pain Management, LLC ("CPM"), in the same location. Artigues and three doctors working at CPM were later indicted on similar charges as the defendants in this case. Artigues and two of the doctors, Rogelio T. Martinez and Osler F. Rivas, pled guilty. The other doctor, Gerardo A. Klug, proceeded to trial before the undersigned and was convicted by a jury on both counts charged in the indictment.

Case No. 3:10cr101/MCR

disagrees, arguing that CPM was the *de facto* successor to Global Pensacola and that evidence that doctors at CPM were prescribing narcotic pain medication outside the usual course of medical practice and for other than legitimate medical purposes has a tendency to show that the defendants in this case conspired to establish clinics in Louisiana and Florida for that purpose. Because the court has not heard evidence regarding the association, if any, between CPM and the defendants in this case, it cannot make a determination as to the relevancy of evidence pertaining to prescribing practices at CPM. The government, therefore, shall make a proffer at the pretrial conference on September 16, 2011, as to the evidence it expects to introduce at trial regarding the defendants' associations with CPM. The court will defer ruling on the admissibility of the opinions set forth in Dr. Parran's May 20, 2007, report until that time.

In addition to the May 20, 2007, report, Dr. Parran prepared four reports based on his review of patient files seized from the Global clinics, all of which Caroni seeks to exclude.[7] According to Caroni, the first report is dated April 10, 2010, and is based on Dr. Parran's review of forty-five patient files; the second report is dated May 20, 2010, and is based on Dr. Parran's review of ninety patients files, including the forty-five patient files referenced in the April 10 report; the third report, which is dated July 26, 2010, is based on the same ninety patient files referenced in the May 20 report, plus three additional files; the final report, dated March 20, 2011, is based on 96 patient files, including the 93 referenced in Dr. Parran's previous report. Caroni argues that Dr. Parran's testimony is inherently unreliable because there is no indication in any of his reports as to the manner in which the patient files he reviewed were selected by the government.[8] Caroni urges the court to

---

[7] The files were provided to Dr. Parran by the government.

[8] According to Caroni, the government has offered a number of conflicting explanations as to the manner in which the files were selected for review. In a July 29, 2011, email, however, counsel for the government explained to Caroni's counsel the manner in which the files were selected and provided to Dr. Parran. According to the email, the government initially sent Dr. Parran a compact disc containing approximately 127 patient files that were randomly selected by a special agent from the files seized from the Louisiana clinics. The compact disc also contained patient records obtained during an investigation of the Louisiana clinics by the Louisiana State Board of Medical Examiners ("LSBME"). Dr. Parran advised the government that the files were too voluminous for him to review; the government thus pared them down and provided Dr. Parran with a list of forty-five files to review. The government later provided Dr. Parran with

conduct a *Daubert* hearing before allowing Dr. Parran to testify at trial to determine the "methodology for selection" of the files Dr. Parran reviewed and, hence, the reliability of Dr. Parran's testimony.

In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993), the Supreme Court held that, when

> [f]aced with a proffer of expert scientific testimony, . . . the trial judge must determine at the outset . . . whether the expert is going to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

Although a hearing may assist the court in determining the admissibility of expert testimony when there is conflicting evidence as to the reliability of the proposed testimony, a hearing is not required with respect to every *Daubert* challenge. *See United States v. Bachynsky*, 415 Fed. Appx. 167, 174 (11th Cir. 2011) (holding that "a *Daubert* hearing was not required because the Government proffered sufficient information to allow the court to qualify [the witness] as an expert in areas of oncology and clinical pharmacology, and because defendant presented no evidence contesting [the witnesses']s testimony or scientific knowledge"); *see also United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2011) (noting that "*Daubert* hearings . . . may be helpful in complicated cases involving multiple expert witnesses," and that district courts "should conduct a *Daubert* inquiry when the opposing party's motion for a hearing is supported by conflicting medical literature and expert testimony") (internal marks omitted)*; United States v. Kyler*, 2011 WL 2150673, at

---

another compact disc containing an additional twenty-four patient files selected based on the government's "investigative efforts." The government asked Dr. Parran to review and prepare a report based on the forty-five patient files stored on the original compact disc, the LSBME files, and the twenty-four files the government added. As government agents reviewed electronic patient files contained on imaged computers seized from the Louisiana clinics, they printed any paperwork that was not contained in the scanned hard copy files provided to Dr. Parran and provided the paperwork to Dr. Parran. Finally, after Dr. Parran prepared his June 26, 2010, report, the government requested that he evaluate three additional patient files, which were incorporated into his final report.

Case No. 3:10cr101/MCR

\*2 (11th Cir. June 2, 2011) (holding that, "although a district court abuses its discretion where it fails to act as a gatekeeper, a formal *Daubert* hearing is not required in every case") (internal marks and citations omitted);[9] *Frazier*, 387 F.3d at 1264 (noting that "some expert testimony will be so clearly admissible that a district court need not conduct a *Daubert* hearing in every case").

While Caroni has couched his challenge of Dr. Parran's testimony in *Daubert* terms, his criticisms go to the weight to be given to Dr. Parran's testimony rather than its admissibility. Indeed, as the government points out, the process of selection for the files Dr. Parran reviewed is not a component of Dr. Parran's methodology, which consisted of reviewing the files provided to him and forming an opinion, based on his knowledge and experience, as to whether the prescribing of narcotics *in those instances* was consistent with the usual course of medical practice and for a legitimate medical purpose.[10] Contrary to Caroni's characterization, this is not a case in which an expert witness intends to render an opinion regarding a universe of information based on a sampling of that information.[11] Dr. Parran thus need not demonstrate that his testimony is based on a statistically significant random sampling of files seized from the Global clinics. Moreover, the fact that Dr. Parran reviewed only 96 of 3500 patient files does not render his opinion as to those 96 files any less reliable than it would be if he had reviewed all 3500 patient files. The

---

[9] While unpublished opinions are not considered binding, they may be considered as persuasive authority. *See* 11th Cir. R. 36-2; *see also United States v. Futrell*, 209 F.3d 1286, 1289 (11th Cir. 2000).

[10] The court's statement regarding Dr. Parran's methodology is based on representations of counsel for the government with regard to Dr. Parran's anticipated testimony in this case, as well as the undersigned's experience, which includes presiding over several similar trials in which Dr. Parran was qualified as an expert and testified. In each trial, Dr. Parran identified the files he reviewed and testified, based on his review of each file, as to the conclusions he reached and how he reached them.

[11] For that reason, the cases Caroni cites for the proposition that Dr. Parran's testimony does not meet the standards for scientific reliability under *Daubert* are inapposite. *See United States v. Ellis*, 193 Fed. Appx. 773 (10th Cir. 2006) (expert testified in drug conspiracy case as to quantity of methamphetamine in drugs seized from defendant based on a sampling of the drugs); *United States v. Rosin*, 263 Fed. Appx. 16 (11th Cir. 2008) (statistician hired in health care fraud case to extrapolate overall loss figures from random statistical sampling of surgical slides); *Mugworld, Inc. v. G.G. Marck & Associates, Inc.*, 2007 WL 2446533 (E.D. Tex. April 23, 2007 (expert based conclusions regarding defects in shipment of mugs on sampling of four-tenths of one percent of mugs contained in shipment).

Case No. 3:10cr101/MCR

issue defense counsel raises relates to the weight, not the admissibility, of the testimony, and counsel will have an opportunity at trial to cross-examine Dr. Parran as to the files he reviewed, as well as those he did not, and argue to the jury about the weight that should be given to Dr. Parran's testimony.

Caroni also suggests that Dr. Parran is not qualified to testify regarding pain management practices. That court rejects this argument as well. As set forth in his reports, Dr. Parran is a board-certified internist who practices general internal and addiction medicine. Dr. Parran also is a faculty member at Case Western Reserve University School of Medicine ("CWRU") and serves as an Associate Clinical Professor of Medicine and Family Medicine, teaches in several residency programs, and is the director of the school's Continuing Medical Education program. Dr. Parran developed addiction fellowship programs at CWRU and has researched and written educational materials about addiction, controlled substance prescribing, and chronic pain and addiction. In addition, for the past twenty-five years or more, Dr. Parran has served as a consultant to various pain management programs. He has presented educational sessions on pain management and addiction issues throughout the country and developed a remedial education course for physicians identified as having problems with controlled substance prescription practices. Based on his qualifications and experience, Dr. Parran repeatedly has been qualified as an expert witness in the areas of pain management, addiction medicine, and prescription writing for controlled substances and has testified numerous times regarding pain management practices, including at least four times in this district, three of which involved trials before the undesigned. The court has little difficulty finding Dr. Parran qualified to testify to the matters set forth in his reports.[12]

Caroni complains further that, although the indictment in this case references the LSBME and its rules and regulations regarding the treatment of non-cancer/related chronic or intractable pain with controlled substances, there is no mention of those rules or

---

[12] The court would note that, while Dr. Parran may not have formally trained in or practiced pain management, experts may be qualified in various ways, including experience in a field. *See United States v. Frazier*, 387 F.3d 1244, 1260-612 (11th Cir. 2001); *see also* Fed. R. Evid. 702.

Case No. 3:10cr101/MCR

regulations in Dr. Parran's reports.  The fact that Dr. Parran does not reference the rules and regulations promulgated by the LSBME has no bearing on the admissibility of his testimony.  The applicable standard of care in this case is the "standard of medical practice generally recognized and accepted in the United States," *see United States v. Merrill*, 513 F.3d 1293, 1306 (11th Cir. 2008), not the standard of care adopted by the State of Louisiana.[13]  That is not to say that state standards of care are irrelevant – they unquestionably will assist the jury in determining whether the defendants in this case acted in accordance with the standard of medical practice generally recognized and accepted in the United States; however, they are not the *sine qua non* of the analysis, and the fact that Dr. Parran does not reference the standard of care adopted by the State of Louisiana – or any other state, for that matter[14] – does not render his opinions irrelevant or unreliable.[15]

Finally, Caroni argues that neither Dr. Robin J. Hammil-Ruth nor Paul Doering should be allowed to testify at trial because the testimony of each is based on the prescribing practices of doctors at CPM.  Caroni also questions the methodology used by Hammil-Ruth and Doering on the same grounds asserted with respect to Dr. Parran and challenges Doering's qualifications.  Specifically, Caroni argues that Doering, who is a consultant pharmacist with a master's degree in clinical pharmacy, is not qualified to render opinions on some of the matters set forth in his report, including "doctor shopping," the street value of and demand for certain drugs, and whether the defendants' prescribing practices with regard to certain identified drugs were in the best interests of patients whose files he reviewed.  As stated above, the court has not heard argument or evidence regarding the association between the defendants in this case and CPM.  As a result, the

---

[13] Curiously, Caroni states in his motion that the government indicted this case under the "Louisiana Pain Rules" and "must be limited to presenting and proving its case under such rules and according to the standard of care provably applicable to Louisiana clinical pain medicine practice."  As Caroni (and his counsel) surely is aware, this is a federal criminal case in which the defendants were indicted under 21 U.S.C. § 841(b)(1)(C) and 18 U.S.C. § 1956(a)(1)(A)(i) and (h), not the "Louisiana Pain Rules."

[14] Caroni also suggests that, because he was indicted in the State of Florida, the government should rely on Florida's rules and regulations regarding the conduct of physicians.

[15] In light of its findings with regard to Dr. Parran's methodology and qualifications, the court need not conduct a *Daubert* hearing.

Case No. 3:10cr101/MCR

court will defer ruling on Caroni's motion regarding the exclusion of Dr. Hammil-Ruth's and Doering's testimony until after the pre-trial conference, at which it will hear the government's proffer on the issue.  For the reasons set forth above, the court rejects Caroni's challenge based on the alleged methodology used by Dr. Hammil-Ruth and Doering.  The court also finds that Doering is qualified to render opinions regarding pharmacology, including the matters referenced above; effects of certain drugs on the body, both in general and when taken in the manner prescribed by Dileo and Pastorek as reflected in the patient files Doering reviewed; and the filling of prescription drugs. Not only does Doering have a master of science degree in clinical pharmacy, but he has been a professor in the college of pharmacy at the University of Florida for the past thirty-five years.  In addition, this court has qualified Doering as an expert in the area of pharmacology on at least three separate occasions.  The court would note, however, that while Doering is an expert in the field of pharmacology, he is not a medical doctor and thus is not qualified to testify whether a given prescription was written for a legitimate medical purpose within the usual course of professional medical practice.

For the reasons set forth above, it is hereby ORDERED that Caroni's motion (doc. 244) is DENIED in part with ruling DEFERRED in part.

DONE AND ORDERED this 13th day of September, 2011.

*s/ M. Casey Rodgers*
**M. CASEY RODGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**